**PRECISION TUNE, INC.**

v.

**TUNE–A–CAR, INC.**

**Civ. A. No. 84–2669.**

United States District Court,
W.D. Louisiana,
Shreveport Division.

Nov. 21, 1984.

Roy S. Payne, Blanchard, Walker, O'Quin & Roberts, Shreveport, La., for plaintiff.

Robert C. Lowther Jr., Lowther & Boone, Many, La., for defendant.

## MEMORANDUM RULING

STAGG, Chief Judge.

Injunctive relief is sought by plaintiff under the provisions of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a). A hearing was held on Monday, October 29, 1984, and the law and evidence leads to the conclusion that injunctive relief is appropriate.

Precision Tune, Inc., offers automobile tuneups and specialized repair services through a series of franchise outlets located throughout the United States. To further its business, plaintiff has secured two certificates of registration from the United States Patent and Trademark Office. One certificate registers plaintiff's name and logo consisting of a jagged line design. (*See* Exhibits P–5 and P–6.) The other certificate registers only the jagged line. In Louisiana, Precision Tune has outlets in Monroe, Alexandria and Baton Rouge. There are no Precision Tune outlets in the Shreveport-Bossier City area. Precision Tune stores are painted various shades of yellow. The exterior walls of the stores feature the jagged line design painted on all sides. The line is composed of five stripes appearing in the following order: orange, brown, yellow, brown and orange. The angles in the jagged line appear at varying intervals on each store in order to accommodate the structural features of the store, such as work bays and doors. A descriptive sign is featured on the stores as well. It consists of a rectangular sign, also in yellow, which states on the left hand side, "Guaranteed Tuneup" and on the right side, "includes parts & labor." The two statements are separated by a white oval containing the price of the tuneup. In addition, the store's name and jagged line logo is displayed prominently on the building itself or on a mounted sign. In either case, the logo displays the words "Precision Tune" in orange against the yellow background. The jagged line design appears in orange, as well. (See Exhibits P–12, P–13 and D–1.)

Tune-A-Car, Inc. operates three outlets offering essentially the same type of service as Precision Tune. One of Tune-A-Car's stores is located in Shreveport, another nearby in Bossier City, and a third franchise outlet operates in Texarkana. The exterior walls of Tune-A-Car's buildings are painted white. Overlaid on this background is a single stripe which is painted around the exterior of the building in an uninterrupted jagged line pattern. The stripe consists of alternating colors of red, fading into orange, which fades into yellow, then back to red. On the front of Tune-A-Car's buildings a rectangular sign features the words, "Guaranteed Tuneup Includes Parts and Labor" in the same configuration as the signs on Precision Tune's outlets. The two phrases are similarly divided by a white oval advising customers of the price of the tuneup. Tune-A-Car's business name is displayed on a mounted sign. The sign contains a vibrant yellow background with the words "Tune-A-Car" in black lettering. Jagged lines appear on either side of the business name. These jagged lines are painted red. (See Exhibits D–5, D–7 and P–2.)

Tune-A-Car's first store opened in Shreveport in 1980. The other two stores opened in 1981. The president and sole shareholder of Tune-A-Car, Richard Copa, testified that his idea to use the color combinations appearing on Tune-A-Car stores resulted from his favorable impression of

businesses in the western United States which were adorned in bright, eye-catching colors. Copa stated that the jagged line featured on his buildings is designed to reflect the electrical impulses which appear on the screen of oscilliscopes. An oscilliscope is an instrument which depicts on a screen changes in electric voltage or current. Copa explained that one "could not tune cars without an oscilliscope." Copa further testified that, although he had seen Precision Tune outlets prior to opening his own business, he decided to use the jagged line as a symbol for the use of the oscilliscope in the performance of Tune-A-Car's services. He explained he did not intend to copy Precision Tune's logo, and views the two designs as dissimilar. Copa notes that the two designs feature a different number of stripes and use different color combinations. Relying on what he perceives to be noticeable distinctions between the appearance of both company stores, Copa has refused to redesign his logo and the exterior of his stores.

Precision Tune opened its first Louisiana store in 1976. Stephen Simmons, general counsel for Precision Tune, indicated that in 1984, Precision Tune operated approximately 230 stores in 26 states. The organizational structure of Precision Tune is such that more than 50 per cent of its revenue comes from the initial franchise fee of $15,000. Although Precision Tune, like Tune-A-Car, uses television, radio and newspaper advertisements, Precision Tune considers its logo as its primary advertising vehicle. In exchange for the franchise fee, the franchisee is offered the "sales, know how and use of Precision Tune's marks and logo." There are 11 stores in Louisiana, in all major cities except Shreveport. (See Exhibit P–9.) Simmons indicated that Precision Tune considers Shreveport a market area in which they would like to open a store. Precision Tune maintains that Tune-A-Car's continued use of the jagged line design impedes its ability to expand into the Shreveport area. Simmons explained that Precision Tune does not believe that it would be wise to open an outlet in this area because it could not guarantee its franchisee exclusive use of Precision Tune's registered mark, and would be asking the franchisee to compete against non-authorized use of the marks.

Simmons also explained that Precision Tune's logo was designed to be a "fanciful representation of the lines appearing on an oscilliscope." Several exhibits were introduced which reflect typical graphs exhibited on an oscilliscope. These graphs show that this scope produces both wavy flowing lines, as well as sharp angular lines.

Copa testified that removal of the jagged line logo from his buildings and signs would present substantial hardship both in terms of effort and expense.

Plaintiff contends that defendant's use of the jagged line design results in an infringement upon plaintiff's right to exclusive use of the design and also constitutes an infringement of trade dress under the Lanham Act. Injunctive relief, plaintiff argues, is appropriate under either 15 U.S.C. § 1114(1) or § 1125.

■■■■ An injunction should issue only if plaintiff demonstrates:

1. A substantial likelihood that it will ultimately prevail on the merits;

2. The showing that the movant will suffer irreparable injury unless the injunction issues;

3. Proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and

4. The showing that the injunction, if issued, would not be adverse to the public interest.

*Vision Center v. Opticks, Inc.,* 596 F.2d 111 (5th Cir.1979); *Canal Authority v. Callaway,* 489 F.2d 567 (5th Cir.1974). The pertinent provisions of the Lanham Act, 15 U.S.C. § 1114(1) states:

Any person who shall, without the consent of the registrant—use in commerce any reproduction, counterfeit, copy or colorable immitation of a registered mark in connection with the sale, offering for sale, distribution or advertising of

any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or, (b) reproduce, counterfeit, copy, or colorably immitate a registered mark and apply such reproduction, counterfeit, copy, or colorable immitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising those goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

The test for infringement actions is the "likelihood" of confusion on the part of the consuming public. *Exxon Corporation v. Texas Motor Exchange of Houston,* 628 F.2d 500 (5th Cir.1980); *Sun-Fun Products v. Suntan Research & Development,* 656 F.2d 186 (5th Cir.1981); *Kentucky Fried Chicken Corporation v. Diversified Packaging,* 549 F.2d 368 (5th Cir.1977). The factors which the court must consider in evaluating the probability of confusion include:

1. The type of trademark;
2. The similarity of design;
3. Similarity of the products;
4. Identity of retail outlets and purchasers;
5. Similarity of advertising media used;
6. Defendant's intent to infringe; and
7. Actual confusion.

*Exxon, supra,* at 504.

TYPE OF TRADEMARK:

Trademarks may be assigned one of four general classifications as being arbitrary and fanciful, suggestive, descriptive, or generic. Classification guides the court in determining the strength of the mark. As the Fifth Circuit has explained:

These were once conceived as distinct categories that are now commonly viewed as "central tones in a spectrum;" within this spectrum the strength of the mark and of its protection, increases as one moves away from generic and descriptive toward arbitrary marks.

*Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.,* 725 F.2d 336. The definitive attributes of the four categories were well explained in *Sun Banks of Florida v. Sun Federal Savings & Loan,* 651 F.2d 311 (5th Cir.1981), which stated:

A strong mark is usually fictitious, arbitrary or fanciful and is generally inherently distinctive. It is afforded the widest ambit of protection. *See, Amstar Corporation v. Domino's Pizza, Inc.,* 615 F.2d at 259, *quoting* Lunsford, *Trademark Basics,* 59 Trademark Rep. 873, 878 (1969). A descriptive mark tells something about the product: it is protected only when secondary meaning is shown. *See, Vision Center v. Opticks, Inc.,* 596 F.2d 111 (5th Cir.1979), *cert. denied,* 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980); *Miss Universe, Inc. v. Patricelli,* 408 F.2d 506 (2d Cir.1969), *but see, Hesmer Foods, Inc. v. Campbell Soup Company,* 346 F.2d 356 (7th Cir.), *cert. denied,* 382 U.S. 839, 86 S.Ct. 89, 15 L.Ed.2d 81 (1965) (barbecue beans used as description, not as trademark). In contrast to the above is the suggestive mark, which subtly connotes something about the service or product. Although less distinctive than a fictitious, arbitrary or fanciful mark and therefore comparatively weak mark, a suggestive mark will be protected without proof of secondary meaning. *See, Soweco, Inc. v. Shell Oil Company,* 617 F.2d 1178, 1184 (5th Cir. 1980) (If used as trademark for refrigerators, the term penguin would be suggestive).

Lastly there are generic terms which communicate "information about the nature or class of an article or service," *America Heritage Life Insurance Company v. Heritage Life Insurance Company,* 494 F.2d 3, 11 (5th Cir.1974), and therefore can never become a service or trademark.

*Id.* at 315.

■ Despite Simmons' characterization of the mark as "fanciful," Precision Tune cannot really claim its mark is truly arbi-

trary or fanciful. By Simmons' own admission, Precision Tunes' design is a stylized adaptation of the impulses reflected on an oscilliscope. Nor, as defendant contends, is the jagged line a generic mark. Generic terms "broadly suggest the basic nature of articles or services." *American Heritage Life Insurance Company, supra,* at 11. The jagged line design does not describe in a broad fashion the nature of plaintiff's services. Rather, it serves as a subtle indication of one of the instruments used in the tune up process and should more properly be classified as a suggestive mark. It is of no consequence that other businesses and service companies use a jagged line in their logo. Defendant has introduced numerous pages from telephone books which indicate that a variety of services employ a jagged line design as part of their logo. In some cases, the jagged line appears to be totally unrelated to the type of service rendered. *See,* Exhibit D–9E, Dallas telephone book, ad 4, El Cheapo Answering Systems. In other cases, the jagged line is used as a symbol of electricity. *See,* Exhibit D–9A, Shreveport telephone book, Camus Electric Company. It is of little import that companies other than those offering auto repair employ the jagged line. Precision Tune is concerned that a company offering similar services in a similar market is using its mark to divert its customers. Similarly, the fact that other infringers may exist is not dispositive in this case. As Mr. Simmons explained, Precision Tune has sought diligently to protect its mark against infringers in the same business. There is no reason to doubt that Precision Tune will continue to attempt to protect its mark in the future.

## IDENTITY OF SERVICE AND CUSTOMERS:

Neither party disputes that the services offered by both companies are identical. Similarly, both companies seek to attract the same customers: the car-driving members of the public. *See, Exxon, supra.*

## SIMILARITY OF DESIGN:

In gauging the similarity of appearance, it is the overall effect of the design rather than a consideration of the individual features which must be considered. *Sun Banks, supra,* at 318; *Amstar Corporation v. Domino's Pizza, Inc.,* 615 F.2d 252, 261; *Armstrong Cork Company v. World Carpets, Inc.,* 597 F.2d 496, 501 (5th Cir.1979). Richard Copa makes much of the fact that the jagged line on his building has but one stripe, and Precision Tune's design uses five stripes. Copa also finds a saving distinction in the use of different color combinations by the two companies. The court does not agree. Viewing pictures of the service outlets of both companies indicates that the design and colors employed by Tune-A-Car appear deceivingly similar. Indeed, if Tune-A-Car's mounted sign were placed in front of a Precision Tune outlet, it would appear to be so harmonious with the Precision Tune building that a customer could easily assume he was visiting a Precision Tune outlet if he failed to note Tune-A-Car's business name on the sign. Despite minor differences in the two designs of the outlets, the overall visual effect, leads to the conclusion that careful inspection is required to distinguish between a Precision Tune store and Tune-A-Car store. (For example, examine Exhibit D–1 and quickly determine whose store is pictured.)

## IDENTITY OF SERVICE FACILITIES:

It is true that Precision Tune does not operate in the Shreveport-Bossier City area. Generally, confusion of the public is unlikely when the registrant and the unauthorized user confine their activities to two distinct and geographically separate markets. *American Foods, Inc. v. Golden Flake,* 312 F.2d 619 (5th Cir.1963). On the other hand, if the evidence demonstrates that the registrant plans to expand into the unauthorized user's trade market, the "expansion area doctrine" allows the registrant to avail itself of the protection of the Lanham Act. *See, Sun Banks, supra.* In *Sun Banks,* the court concluded that the

registrant had presented sufficient evidence of its intent to expand into the trade area of the alleged infringer, thus entitling the registrant to claim the protection of the Act. Mr. Simmons' statement that Precision Tune considers the Shreveport-Bossier City area a "target for development" is sufficient to establish the applicability of the expansion area doctrine in this case. Thus, for purposes of this suit, it is apparent that Precision Tune and Tune-A-Car are competing within the same market.

## SIMILARITY OF ADVERTISING MEDIA:

As noted above, both Precision Tune and Tune-A-Car use television, radio and newspapers for purposes of promoting their services. This factor does not weigh as heavily in the likelihood of confusion equation because Precision Tune has not begun advertising in the Shreveport-Bossier City area. Nonetheless, in order to expand into this vicinity, Precision Tune would be employing the same advertising media as Tune-A-Car, within the same geographical area.

## DEFENDANT'S INTENT:

If the evidence reveals that defendant specifically intended to copy plaintiff's mark, this factor alone might be sufficient to allow the court to conclude that confusing deception exists. *Amstar Corporation, supra,* at 263; *Chevron Chemical Company v. Voluntary Purchasing Groups,* 659 F.2d 695 (5th Cir.1981). In the present case, there was no direct evidence to indicate that Copa set about the task of duplicating Precision Tune's logo. Instead, Copa testified that he wanted to suggest oscilliscope patterns in eye-catching colors. The level of similarity in the two designs seems too high to be the product of coincidence, especially since Copa admitted having seen a Precision Tune outlet prior to creation of his design. As a credibility choice, the court rejects Copa's denial of intent to copy the Precision Tune logo.

## ACTUAL CONFUSION:

No evidence was introduced to demonstrate that consumers had been confused

by the similarity between the two logos. Of course, even in cases of actual confusion, "countervailing circumstances which lessen the impact of asserted instances of confusion," *Sunbanks, supra,* at 319, can be sufficient to overcome cases of actual confusion. Instead, the trial court must consider *all* evidence to determine whether the likelihood of confusion exists.

In this case, the likelihood of confusion is so strong that plaintiff's ultimate probability of success on the merits is great. The single most persuasive factor in the equation consists of the uncanny resemblance of the designs employed in the signs used by both companies.

Words can easily describe the differences in the two designs, but the similarities are more difficult to articulate. The pictures introduced at the evidentiary hearing speak for themselves. Only upon careful consideration can the differences in the two logos be perceived. If the distinctions are difficult to find in an atmosphere of intense concentration, how much more complicated is the task faced by the average consumer who relies upon his memory of jagged lines and bright colors to select a tune up specialist. Moreover, the consumer's failure to discriminate between the two companies may be exacerbated by the fact that the two symbols would not appear side-by-side in the market place, thus making careful examination improbable. *See, Sun-Fun, supra,* at 192.

In summary, the court concludes that the likelihood of confusion is great, and that Precision Tune has, therefore, demonstrated the requisite likelihood of success on the merits.

Before discussing the other factors which are prerequisites for injunctive relief, it is necessary to determine whether Precision Tune has demonstrated a likelihood of success on the merits of its claim for unfair competition under § 1125(a). That statute provides, in pertinent part:

Any person who shall affix, apply, or annex, or use in conjunction with any goods or services, or any container or containers for goods, or false designation of origin, or any facts, description or representation, including words or other similars tending falsely to describe or represent the same and shall cause such goods or services to enter into commerce, and any person who shall acknowledge the falsity of such designation of origin or description or representation caused or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes he is or likely to be damaged by the use of any false description or representation.

An action for unfair competition under this statute allows a business to seek redress of what is commonly called trade dress infringement. That term has been defined as follows:

"Trade dress is a concept which embraces the total image of a given product, including advertising materials and marketing techniques used to promote its sales." *Falcon Rice Mill v. Community Rice Mill*, 725 F.2d 336 (5th Cir.1984), *citing John Wright, Inc. v. Casper Corp.*, 419 F.Supp. 292, 317 (E.D.Pa. 1976), *rev'd in part on other grounds sub nom. Donsco, Inc. v. Casper Corp.*, 587 F.2d 602 (3d Cir.1978).

The essence of an action for trade dress infringement lies in the prohibition against "palming off" ones product as that of another by employing deceptively similar packaging or trade dress. *Falcon Rice Mill, supra*, at 343 n. 6. As in trademark infringement cases, the crucial question is whether the contested trade dress creates a likelihood of confusion. *Falcon Rice Mill, supra*, at 343; *Chevron Chemical Company, supra*, at 703; *Sun-Fun, supra*, at 192; *Amstar Corporation, supra*, at 259. In unfair competition actions under § 1125, however, the scope of inquiry into similarity of design is considerably broader, since the court must consider overall trade dress of the product rather than mere similarity of design to a registered mark. *Sun-Fun, supra*, at 192.

In assessing whether an infringement has occurred, the court considers *Chevron, Inc., supra*, to be most persuasive. In that case, Chevron sought to deter Voluntary Purchasing Groups ("VPG") from using a distinctive combination of white, yellow and red on its lawn and garden products' packaging. For many years, Chevron had produced Ortho gardening chemicals, which it packaged in brown bottles covered by labels featuring a band of white above a band of yellow above a band of red. The brand name "Ortho" appeared on the white band in black, block letters. The name of the product was contained on the yellow band with general instructions featured on the red band. In 1976, VPG placed its "Hi-Yield" brand of garden products on the market. Hi-Yield also featured a brown bottle with a label containing white, yellow and red bands. Although the white and yellow stripes were slightly narrower than those contained on the Ortho products, that distinction and the brand name "Hi-Yield" were the only distinguishing features. In concluding that trade dress infringement had occurred, the court observed:

Ortho could not preempt the use of red and yellow, nor does it seek to do so. It seeks only to protect the combination of particular hues of these colors, arranged in certain geometric designs, presented in conjunction with a particular style of printing, in such fashion that, taken together, they create a distinctive visual impression.

*Id.* at 703.

The *Chevron* court employed the "digits" of confusion used in trademark infringement cases to determine whether or not VPG's product might tend to confuse consumers. Obviously, the discussion of these factors above is applicable to Precision Tune's claim of trade dress infringement. Indeed, the likelihood of confusion under § 1125 is greater than under plain-

tiff's trademark claims, since the strongest factor in this case is the similarity of design. Consequently, the court concludes that there is a likelihood that consumers would be confused by defendant's attempt to "palm off" its establishments as those of plaintiff.

■ Having concluded that the plaintiff has demonstrated a likelihood of success on the merits under either claim, the question now becomes whether the remaining three factors required for the issuance of an injunction have been met. As noted above, Precision Tune is required to show that it will suffer irreparable injury unless the injunction issues. Mr. Simmons indicated that Precision Tune feels compelled not to open an outlet in the Shreveport-Bossier City area so long as Tune-A-Car is using the jagged line logo and the distinctive color combination employed by those businesses. Clearly, being deprived of an opportunity to expand its market creates an injury not susceptible of measurement in damages. As the court stated in *Boston Professional Hockey Assn. v. Dallas Cap & Emblem Manufacturing, Inc.*, 510 F.2d 1004 (5th Cir.1975), "only a prohibition of the unauthorized use will sufficiently remedy the wrong." So long as Tune-A-Car continues to employ the deceptively similar marks and trade dress, Precision Tune cannot attempt to open a franchise because it cannot guarantee its franchisee's exclusive use of the mark. Accordingly, plaintiff has demonstrated a sufficient level of irreparable injury.

■ Precision Tune must also show that the injury it suffers without the injunction outweighs the damage the injunction will cause to Tune-A-Car. In balancing the threatened harm to be suffered by the two parties, it is apparent that the harm to Precision Tune is greater. If no injunction issues, Precision Tune is, for all practical purposes, prohibited from expanding into the Shreveport-Bossier City market area. Conversely, if the injunction issues, Tune-A-Car can continue to operate its business subject to the limitation that it

may not use Precision Tune's logo and color combinations.

■ Finally, Precision Tune is obligated to demonstrate that the injunction would not be adverse to the public interest. In reality, the public interest would best be served by the issuance of an injunction. Tune-A-Car could continue to offer its services while the public enjoys "interstate ... commerce free of unfair competition." *American Rice v. Arkansas Rice Growers Co-Op*, 532 F.Supp. 1376 (F.D.Tex.1982), *aff'd* 701 F.2d 408 (5th Cir.1983).

As a result of plaintiff's having met its burden of proof under the *Vision Center* test, the court concludes that the issuance of a preliminary injunction is appropriate.

Accordingly, defendant is hereby ENJOINED *pendente lite* from using, adopting, distributing, promoting, or in any way using to its advantage, the registered jagged-line design of plaintiff, or any other jagged line design or trade dress deceptively similar to that of plaintiff.

In addition, the provisions of this Ruling shall take effect thirty (30) days from this date.

An Order consistent with the terms of this Ruling shall issue herewith.