**MISS UNIVERSE, INC.**

v.

**Robert J. PITTS and Vicky Durbin Pitts.**

Civ. A. No. 89–0489.

United States District Court,
W.D. Louisiana,
Shreveport Division.

April 14, 1989.

Michael A. Cardozo, Chaim A. Levin, Proskauer, Rose, Goetz & Mendelsohn, New York City, John M. Madison Jr., Susie Morgan, Wiener, Weiss, Madison & Howell, Shreveport, La., for plaintiff.

E. Ray Kethley, Frances Baker Jack, Jacqueline Taylor, Shreveport, La., for defendants.

## MEMORANDUM RULING

STAGG, Chief Judge.

On March 1, 1989, MISS UNIVERSE, INC., plaintiff herein, filed the instant suit against Robert J. Pitts and Vicky Durbin Pitts, defendants herein, alleging violations of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, the Louisiana Unfair Competition Statute, La.Rev.Stat.Ann. 51:1401 *et seq.* and the Louisiana Trademark, Trade names and Antidilution Statute, La.Rev.Stat.Ann. 51:211 *et seq.* On the same date, plaintiff filed the present motion for a preliminary injunction. Plaintiff seeks to have this court preliminarily enjoin the defendants from using the names MRS. USA, MRS. UNIVERSE and/or MRS. [STATE OR LOCALITY] USA. The court has read the affidavits and depositions, examined the exhibit books, listened carefully to the testimony of all witnesses at the hearing and for the reasons that follow concludes that the preliminary injunction should be granted.

## FACTS

Plaintiff began its operations in the pageantry business in 1952, periodically conducting pageants under the names MISS USA and MISS UNIVERSE. Most recently, on February 28, 1989, the MISS USA contest was held in Mobile, Alabama. The Mobile pageant, like all of plaintiff's pageants, was the subject of much public attention. It is estimated that over 20 million people watched the pageant on television. In May of this year, MISS USA will go to Cancun, Mexico, and, along with women representing at least 60 other countries, compete for the title MISS UNIVERSE. Approximately 100 million people are expected to watch the finals of this pageant.

The road to the finals begins with a series of pageants conducted on a statewide basis by individuals holding licenses from plaintiff. Each pageant is conducted in accordance with guidelines published by plaintiff in an Operations Manual. This manual, which is designed to ensure quality and uniformity among the many pageants, prescribes the entry forms, the conduct of the pageant, judging procedures, prizes and gifts and program books. In all of plaintiff's pageants, each contestant is judged in three categories: (1) evening gown, (2) swimsuit and (3) personal interview.

The winner of each state carries the title MISS [STATE] USA and these winners are the only competitors allowed in the annual MISS USA pageant. The MISS USA pageant, which is hosted by a different city each year, is broadcast nationally by CBS and distributed by Paramount Pictures to over 20 countries. In 1987, this pageant was the third most watched television special that season.[1]

MISS UNIVERSE expanded its pageant operations in 1983 to include a MISS TEEN USA pageant. This competition is open to unmarried females ages 15 to 18, whereas the older ladies, ages 17 to 34, compete in the MISS USA pageant. Contestants in the MISS TEEN USA pageant are winners from the various state preliminaries, which are also conducted by licensees of MISS UNIVERSE. The annual television audience for the MISS TEEN USA pageant is estimated to be at least 40 million people in the United States alone.

Enormous sums are expended by plaintiff and others in supporting and promoting the various pageants. Proctor & Gamble

---

1. It is noteworthy that the ratings for CBS in general have declined over the last several years. Michael Bracken, vice president of plaintiff's legal and business affairs, attributed the decline to the network's "number three" status and the television industry's competition with other forms of entertainment such as videotapes.

Company pays an annual fee of approximately $6 million to sponsor the MISS UNIVERSE, MISS USA and MISS TEEN USA television programs. $200,000 will be spent by plaintiff, alone, in advertising and promoting the three pageants for 1989. Other sponsors include J.C. Penney, which has guaranteed plaintiff an annual minimum royalty of $150,000 for the use of the name MISS USA, in connection with a line of clothing.

Plaintiff's first mark, MISS UNIVERSE, was initially registered on January 31, 1956. Affidavits of continuing use and incontestability have also been filed. The registration was renewed on January 31, 1986. On May 24, 1966, plaintiff registered the mark MISS USA. An affidavit of continuing use has been filed, and the registration was renewed on May 24, 1986. The marks MISS USA and MISS USA COLLECTION have also been registered in connection with items such as dolls, sportswear and jewelry. Plaintiff has also obtained registration for the name MISS [STATE] USA in many states throughout the United States. Additionally, the mark MISS UNIVERSE has been registered in approximately 70 countries.

The Pittses have become increasingly involved in the pageant business over the last several years. Along with their modeling and advertising businesses, they maintain a full-time pageant office in Shreveport. Both defendants have judged pageants on various levels.

The first pageant in which the Pittses were involved was the MISS BOSSIER CITY USA and the MISS TEEN BOSSIER CITY USA pageant, held August 24, 1986. Janet Hill Rice, executive producer of this pageant, introduced the Pittses to Fran LaSalle, state director for plaintiff's local Louisiana pageants. Mr. LaSalle authorized Ms. Rice, and subsequently the Pittses, to produce this pageant as the official local preliminary to the MISS LOUISIANA USA and MISS TEEN LOUISIANA USA pageants. On October 4, 1986, the Pittses conducted the MISS SHREVEPORT USA and the MISS TEEN SHREVEPORT USA. They also conducted the MISS MINDEN USA and MISS TEEN MINDEN USA pageants on October 18, 1986. The winners from these preliminaries competed at the MISS LOUISIANA USA and MISS TEEN LOUISIANA USA pageants held on November 8, 1986.

The Pittses' second MISS SHREVEPORT USA and MISS TEEN SHREVEPORT USA pageant was conducted on July 25, 1987. Because the 1986 pageants lost money, several new divisions, including TINY, JUNIOR MISS and *MRS.* were added. Even more divisions were added to the MISS BOSSIER CITY USA and the MISS TEEN BOSSIER CITY USA pageant held on August 29, 1987. The Shreveport and Bossier pageants were repeated in 1988, with some success.

The first (and to this date, the only) MRS. LOUISIANA USA pageant was held on October 29, 1988. According to the defendants, they got the idea for forming such a pageant from the winners of their MRS. SHREVEPORT USA and MRS. BOSSIER CITY USA pageants. Apparently, these ladies represented their respective cities in the MRS. LOUISIANA AMERICA pageant, because they had no other pageant to advance to. According to the defendants, the defendants were requested to expand their pageants into the national and international arenas.

The Pittses' preparations began. Mr. Pitts applied to the Secretary of State of each state for registration of the mark MRS. [STATE] USA. He also applied to federally register the marks MRS. USA and MRS. UNIVERSE in the United States Trademark Office. An application to register the mark MRS. NORTH AMERICA, was also made.

Whether one calls the MRS. LOUISIANA USA pageant a success, depends on one's perspective. Contestants were originally told that the pageant would be held in Baton Rouge, Louisiana, in November 1988 in conjunction with the MISS LOUISIANA USA and MISS TEEN LOUISIANA USA pageants. The schedule of events for the pageants included a "USA Party" to be held on the Friday night of the pageant. The MISS LOUISIANA USA pageant

would be held the next day, and the MRS. LOUISIANA USA pageant would be held on Sunday. Contestants were mailed a schedule of activities that included not only the MRS. LOUISIANA USA pageant, but also the MISS LOUISIANA USA pageant.

Despite the above preparations, the Pittses' pageant plans were changed.[2] The MRS. LOUISIANA USA pageant was held, instead, on a boat called the "La Cruise." The contestants boarded at Port Fourchon in Galliano, Louisiana. According to some, the contestants were told enticing tales of large dressing rooms, lavish buffets and casino gambling. The schedule of events as set out in the program booklet was as follows: Parade of Contestants, Introduction of Judges, Introduction of Auditors, Introduction of Visiting Queens, Entertainment, Swimsuit Competition, More Entertainment, Evening Gown Competition, More Entertainment, Introduction of Special Guests, Recognition of Sponsors, More Entertainment, and, finally, the Naming of Winners.[3]

As alluded to earlier, things did not go smoothly. Only seven contestants participated in the competition; there were only three judges and possibly one auditor.[4] No visiting queens participated. The scheduled entertainment failed to show up. There was no introduction of special guests. The recognition of sponsors consisted of mentioning the names of those who had placed ads in the program booklet. None of the sponsors mentioned were on the boat. Deposition of Robert Pitts, Vol. I, pp. 33–35.

The lavish buffet was nothing more than a cafeteria line, and contestants were required to share, four at a time, a $4' \times 6'$ dressing room. The elevated runway had been taped together and the runway carpet was rumpled and ravelled. The boat constantly rocked during the entire pageant such that contestants were unable to show off their poise and/or modeling skills.[5]

Plaintiff was contacted by the Pittses in November of 1988. At that time, Mr. Pitts proposed that he become affiliated with the plaintiff to produce a national married women's pageant. At a subsequent meeting, on December 8, 1988, defendant informed Michael Bracken, vice president of plaintiff's legal and business affairs department, that he was in the process of registering the marks MRS. USA, MRS. UNIVERSE and MRS. [STATE] USA. Mr. Pitts proposed that he administer a MRS. USA and MRS. UNIVERSE pageant for $100,000 per year plus 10 percent of the profit. Plaintiff's executives informed Mr. Pitts that they would consider the proposal, but informed him that plaintiff considered his use of the name MRS. USA to be an infringement of plaintiff's rights in its marks.

That plaintiff objected to the Pittses' use of these names came as no surprise to Mr. Pitts. In fact, in a letter from him to Bruce Lucker, Mr. Pitts stated:

[Mr. Bracken], of course, said that MISS UNIVERSE would object. *I fully expect you to*, but I hope that we can have a workable business relationship with positive energy instead of the wasted ex-

2. It is clear that the Pittses changed their plans only after learning from LaSalle that an executive from plaintiff's parent corporation, Madison Square Garden, Inc., was going to observe LaSalle's pageant. According to Mr. Pitts, LaSalle asked him if he could reschedule his "MRS." pageant. Mr. Pitts testified that he moved it to play it safe.

3. The interveiew stage of the competition took place out of the presence of the audience.

4. During his deposition, Mr. Pitts was never clear as to whether there was only one auditor. Deposition of Robert Pitts, Vol. I, p. 33. The videotape of the pageant shows that only one

auditor was introduced to the audience. Plaintiff's Exhibit 45B.

5. Mrs. Christy Willson, winner of the defendants' Mrs. Louisiana USA Pageant, testified that only one contestant, Janet Peckenpaugh, had difficulty maintaining her balance. This testimony is simply incredible. The videotape of the pageant clearly shows that all of the contestants, including Mrs. Willson, had difficulty maintaining their balance. Plaintiff's Exhibit 45B. For safety reasons, the boat's crew members stood on both sides of the contestants to catch them in case of a fall. According to Mr. Pitts, contestants did not lose points because of the rolling seas.

pense of trademark objections and appeals court.[6]

Emphasis added. Plaintiff rejected Mr. Pitts' proposal in a letter dated January 13, 1989. This letter again reiterated plaintiff's position regarding the use of the names in question.

## ANALYSIS OF LAW AND FACTS

Plaintiff's burden in this motion for a preliminary injunction is heavy. The standard is not disputed. To succeed, plaintiff must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury to plaintiff if the injunction is not issued; (3) that the threatened injury to plaintiff outweighs any damage the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest. *Moore Business Forms, Inc. v. Seidenburg*, 619 F.Supp. 1173, 1179 (W.D.La. 1985), *citing Enterprise International, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 471 (5th Cir. 1985).

## LIKELIHOOD OF SUCCESS ON THE MERITS:

Plaintiff first claims that the defendants infringe its registered trademarks in violation of 15 U.S.C. § 1114. A cause of action for the infringement of a registered trademark in violation of this section exists where a person uses (1) any reproduction, counterfeit, copy or colorable imitation of a mark (2) without the registrant's consent (3) in commerce (4) in connection with the sale, offering for sale, distribution or advertising of any goods (5) where such use is likely to cause confusion, or to cause mistake or to deceive. *Moore, supra,* at 1180, *citing Boston Professional Hockey Association v. Dallas Cap and Emblem Manufacturing*, 510 F.2d 1004, 1009–10 (5th Cir.1975), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975).

The defendants do not dispute that the first four elements are met in this case. Plaintiff is the holder of numerous registered marks, including MISS UNIVERSE and MISS USA. The first of these marks

was registered in 1956. Defendants are reproducing their own colorable imitation of these marks in connection with the promoting of their MRS. USA pageant. Plaintiff has never consented to the defendants' use of the marks in question and has repeatedly informed the defendants that their use of the marks in question constitutes an infringement of plaintiff's marks. As defendants are actively soliciting directors from all 50 states, there can be no dispute that the defendants' use of the marks in question constitute interstate commerce. Additionally, the marks are used by the defendants in connection with the distribution and advertising of their pageants.

■ The fifth element, likelihood of confusion, is the "essential question" in a claim of trademark infringement. *Sun Banks of Florida v. Sun Federal Savings & Loan Association*, 651 F.2d 311, 314 (5th Cir.1981). This element is established by an amalgam of factors. *Moore, supra.* The factors enumerated by the United States Court of Appeal for the Fifth Circuit include: (1) strength of plaintiff's mark; (2) similarity of design between the marks; (3) similarity of the products; (4) identity of retail outlets and purchasers; (5) similarity of advertising media used; (6) the defendant's intent; (7) actual confusion; and (8) the degree of care exercised by potential purchasers. *Oreck Corp. v. U.S. Floor Systems, Inc.*, 803 F.2d 166, 170 (5th Cir. 1986), *cert. denied* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987). A finding of likelihood of confusion need not be supported by a majority of these factors. *Louisiana World Exposition v. Logue*, 746 F.2d 1033, 1040 (5th Cir.1984).

■ The first factor to consider is whether plaintiff's marks are "strong" or "weak." Trademark strength may be generally defined although the concept of trademark strength and weakness is, at best, amorphous and not susceptible of easy definition. *Moore, supra.* A strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that

---

6. Defendants' Exhibit 34.

is often used by other parties. The more distinctive a trademark, the greater its strength.[7] *Exxon Corporation v. Texas Motor Exchange of Houston,* 628 F.2d 500, 504 (5th Cir.1980). In a suit based on infringement, there is no distinction between the various forms of marks, *e.g.,* a trademark, a service mark, or a business name (trade name). *Moore, supra.* The stronger or more distinctive a mark is, the broader the scope of protection it should be accorded and the more likely that another business using a similar name will cause confusion among ordinary consumers. *Miss Universe, Inc. v. Little Miss USA, Inc.,* 212 U.S.P.Q. 425, 428 (N.D.Ga.1981); *Amstar Corporation v. Domino's Pizza,* 615 F.2d 252, 259 (5th Cir.1980).

Plaintiff has gone to great expense and effort to popularize its pageants and induce consumers to associate its marks with its pageants. That this campaign has been successful is evident from the high prices advertisers and the networks are willing to pay to sponsor and broadcast these pageants. As mentioned, the MISS USA finals have been broadcast nationally by CBS for many years. Television audiences are estimated to be 50 million nationally and 100 million worldwide. Proctor & Gamble, alone, pays an annual fee of $6 million to sponsor the specials. Other courts have found plaintiff's marks to be strong. *See Miss Universe, Inc. v. Little Miss USA, Inc., supra,* at 429; *Miss Universe, Inc. v. Patricelli,* 753 F.2d 235, 238 (2nd Cir.1985). This court is inclined to agree. As testimony at the hearing indicates, plaintiff's marks appear firmly affixed in the minds of consumers as designations of plaintiff's pageants.[8]

The defendants' MRS. USA and MRS. UNIVERSE marks are substantially similar to plaintiff's MISS USA and MISS UNIVERSE, both visually and in the way they sound. Similarity of design is determined on the basis of the *total effect* of the designation, rather than on a comparison of individual features. *Moore, supra.* Absolute identity is not required in order to establish an infringement. In comparing the marks, the court should place emphasis on the overall impression the marks as a whole create, including the context in which they will be used. *Miss Universe, Inc. v. Little Miss USA, Inc., supra,* at 430.

Clearly, plaintiff's and defendants' marks are not identical; they are, nonetheless, similar. Indeed, the only distinguishing feature is the change from the letter "i" in MISS to the letter "r" in MRS. and the addition of the period after the abbreviation, MRS. Both prefixes, MISS and MRS., are often pronounced much the same. At the hearing, counsel for the defendants consistently addressed witnesses as "Miss", even though he knew them to be married.

Plaintiff's and defendants' products are also similar. Both parties are in the business of promoting and producing beauty pageants. In these pageants, young women compete with one another in the hope of being selected the overall winner by a panel of judges. Although only married women are allowed to compete in the defendants' pageants and unmarried women are permitted to compete in plaintiff's pageants, they are structured along the same general lines. The contestants are judged

---

7. Under the jurisprudence, there are four categories of marks: (1) strong marks (usually fictitious, arbitrary, or fanciful); (2) descriptive marks (tells somethign about the product); (3) suggestive marks (subtly connotes something about the service or product); and (4) generic terms (communicates information about the nature or class of an article or service). *Moore, supra* at 1180–1181; *Precision Tune, Inc. v. Tune–A–Car, Inc.,* 611 F.Supp. 360, 364 (W.D.La. 1984).

8. The defendants concede in their written closing argument that plaintiff's marks are reg-istered and have achieved incontestable status. A mark that has become "incontestable" under Section 15 of the Lanham Act, 15 U.S.C. § 1065, cannot be challenged as lacking secondary meaning. *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786, 794, n. 5 (5th Cir. 1983). A secondary meaning arises when the primary significance of the trademark in the minds of the consuming public is to identify the producer. *Louisiana World Exposition, supra* at 1040, n. 7. *See also, Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.,* 856 F.2d 1445, 1448, n. 4 (9th Cir.1988).

on the same three categories and the progression to the next higher pageant is the same.

As to the fourth factor, identity of retail outlets and purchasers, both the plaintiff and the defendants operate beauty pageants for women, including state, national and international components.[9] Neither, of course, sells fungible goods, and, therefore, they have no retail outlets as such. In this case, as in *Miss Universe, Inc. v. Miss Teen USA, Inc.,* 209 U.S.P.Q. 698, 706 n. 5 (N.D. Ga.1980), purchasers could consist of four groups: (1) the group of potential contestants; (2) the interested advertisers and television networks; (3) the viewing audience; or (4) all of the above. The court finds that the appropriate class consists of those individuals likely to attend a pageant as a spectator or watch a telecast, and all those who might be inclined or persuaded to place an advertisement with either of the two parties. *Id.* Having thus defined the purchasers as such, the court finds a substantial identity of purchasers. Plaintiff and defendants operate on a national scale, with the same progression of contests. Both parties pursue sponsors, advertisers and franchisees to support and promote their contests.

There is a substantial likelihood that the defendants will use the same media outlets for advertising their pageants as plaintiff now uses. At the present time, most of the defendants' advertising appears confined to pageant publications. But even now, and certainly more so in the future as the defendants' pageant grows in popularity, there is a real danger that, as a result of unsolicited and solicited publicity in newspapers, radio and television, plaintiff's and defendants' marks will be juxtaposed.[10]

■ The issue of the defendants' intent is a troublesome one. Proof of the defendants' intent to benefit from the good reputation of the plaintiff's "products" is not required in order to establish infringement.

*Oreck Corp., supra,* at 173. If such an intent can be shown, however, it may provide compelling evidence of a likelihood of confusion. *Id., citing Exxon, supra,* at 506. Obviously, Mr. Pitts chose the marks in question with full knowledge of plaintiff's similar marks. Mr. Pitts testified that he conceived of the name MRS. UNIVERSE in October of last year. He testified that the other names he considered using included MRS. AMERICA (which he found to be already in use), MRS. WORLD (which he also found already in use), MRS. NORTH AMERICA and MRS. GALAXY. He decided against MRS. GALAXY after someone told him that the name had a bad reputation.

■ Where a defendant adopts a mark with full knowledge of a plaintiff's identical or clearly similar mark, courts have held that wrongful intent may be inferred. *Exxon Corporation v. Humble Exploration Company, Inc.,* 524 F.Supp. 450, 462 (N.D.Tex.1981), *reversed on other grounds,* 695 F.2d 96 (5th Cir.1983); *Masterpiece of Pennsylvania, Inc. v. Consolidated Novelty Company,* 368 F.Supp. 550, 552–53 (S.D.N.Y.1973). Mr. Pitts testified in his deposition that when he asked Mr. LaSalle, back in December of 1987, his opinion with respect to the names he intended to use, Mr. LaSalle responded: "Yes, I feel they would be great names, but I feel they are already registered." Deposition of Robert Pitts, Vol. II, p. 9. Mr. Bracken advised defendants that plaintiff believed defendants' use of the marks in question constituted an infringement of its protected marks. On page 7 of the program booklet for the April 17, 1988 MISS SHREVEPORT USA and MISS TEEN SHREVEPORT USA, the following statement is found: "We are not just USA!" The program then goes on to explain the activities of the defendants in sponsoring various pageants up to that

---

9. The court recognizes the defendants have not yet conducted a national pageant. According to the testimony, however, the defendants are actively seeking state directors with the purpose of moving in that direction.

10. Beauty pageants, local, state and national, continue to be the subject of much publicity, particularly from the print media. *See* Plaintiff's Exhibit 4.

date. In explaining the above-quoted statement, Mr. Pitts, in his deposition, stated:

> The previous years that we were affiliated in the pageant business, we were strictly doing USA preliminary pageants. As we grew, we added mother-daughter, Northwest Louisiana high school pageants. We also started training girls for the Miss America programs in talent as well as other things and a lot of people in the area just assumed that because we had been doing those other pageants that we were just strictly connected with USA and this was our official way of letting them know that we did more than just the Shreveport–Bossier official local preliminary pageants.

Deposition of Robert Pitts, Vol. II, p. 90. On page 10 of the same pageant booklet, the defendants placed pictures of both MRS. SHREVEPORT and MISS SHREVEPORT contestants. The defendants also included the MISS UNIVERSE logo on the same page. On page 3 of that program booklet is a proclamation from Shreveport Mayor John Hussey, proclaiming Sunday, April 17, 1988 as "MISS SHREVEPORT USA, MISS TEEN SHREVEPORT USA and MRS. SHREVEPORT USA Day."

Defendants also knew, prior to the filing of this lawsuit, that some states had reservations about allowing registration of the name MRS. [STATE] USA. Defendants' registration in the state of Georgia was required to contain the disclaimer, "Not affiliated with the MISS or TEEN USA," immediately following the name MRS. GEORGIA USA. Defendant's Exhibit 30. A similar disclaimer was required in the State of Idaho. *Id.* In sum, the evidence before the court at this time indicates a desire on behalf of the defendants to trade on the good will and reputation of plaintiff. Thus, even in the absence of inferred intent, the court finds some evidence of actu-

al intent.[11] Defendants' actions violate the principle that a newcomer to a business must select a name with care so as to avoid any confusion or even the appearance that it intended to trade off a more established name. *Miss Universe Inc. v. Miss Teen USA, Inc.,* 209 U.S.P.Q. at 710.

The court also finds evidence of actual confusion. The Fifth Circuit has noted that although a showing of actual confusion is not mandatory, it is patently the best evidence of likelihood of confusion. *Louisiana World Exposition, supra,* at 1041. Mr. Pitts readily admitted that several people have asked him whether or not he was affiliated with the plaintiff's organization. He also admitted that an advertiser, Jack Richard, from Proctor & Gamble Productions, asked whether or not he was affiliated with plaintiff. The evidence in the record also indicates that at least two contestants in the MRS. LOUISIANA USA pageant conducted by the defendants on October 29, 1988, thought the pageant was affiliated with plaintiff. These beliefs were apparently based upon statements made by the Pittses to the contestants, the Pittses' description of the pageant, the contestants' observations of the MISS LOUISIANA USA pageant schedule on the application form for the MRS. LOUISIANA USA pageant, the similarity in the structure and names of the pageant systems and the similarity of the logos used by both the plaintiff and the defendants. In sum, there is sufficient evidence at this stage of the proceedings to conclude that actual confusion exists among potential advertisers and contestants.[12]

The likelihood of confusion in this case does not stem only from the possibility that a consumer might mistake the defendant services for those of the plaintiff. The real danger lies in the probability that this same

---

**11.** The court notes in passing that the Pittses have not always been entirely candid. For example, the official entry forms to the MRS. LOUISIANA USA PAGEANT refer to the defendants as "Nationally Certified State Directors, Coaches, and Judges". Plaintiff's Exhibit 39. At the hearing, Mr. Pitts admitted that there is no such certification.

**12.** The court is aware that several of the defendants' witnesses who testified as to the issue of confusion had a business relationship with the defendants and were very experienced and sophisticated in the pageant business. *See, Miss World (UK) Ltd., supra,* at 1450 n. 5. (likelihood of confusion is to be determined at the level of the general public, the casual, average, purchaser, not professionals or experts in the field).

consumer may associate the defendants with the plaintiff. *Miss Universe, Inc. v. Miss Teen USA, Inc.*, 209 U.S.P.Q. at 709. Thus, it would be quite reasonable to assume that the defendants' MRS. USA pageant is an offshoot of the plaintiff's MISS USA pageant.[13] And the most haunting problem in this case is that the defendant has done little to deter this impression or to mitigate the probable confusion.[14] Thus, the court finds a substantial likelihood of confusion as to the origin and/or sponsorship of the defendants' pageants. Such confusion exists, as the Fifth Circuit has said:

> When the sponsor or maker of one business or product might naturally be assumed to be the maker or sponsor of another business or product, the confusion evident in such cases is confusion of the business; the deceived customer buys the infringer's product in the belief that it originates with the trademark owner or that in some way is affiliated with the owner. When this occurs, the infringer is unjustly trading on the true owner's established reputation. This is the precise wrong trademark legislation seeks to prevent.

*World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 488 (5th Cir. 1971). The court finds such a situation in this case. *See also Fuji Photo Film v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 596 (5th Cir.1985) (court recognized that an action will lie when the infringer's use of plaintiff's mark results in confusion as to the origin of plaintiff's product).

The final factor, the degree of care exercised by potential purchasers, is less clear. The court believes that before corporate sponsors pay millions of dollars, they will perform a careful inquiry as to the origin of defendants' product and its affiliation with plaintiff. Defendants, however, do not yet operate and have not yet operated on such a large scale. To date, most of the advertising sold by the Pittses consists of individual ads placed by local retail merchants in pageant program books. Many of these ads are solicited directly by the contestants themselves. Indeed, the defendants offer their contestants substantial commissions to encourage contestants to sell aggressively. Thus, the defendants have no direct control over the information conveyed by the contestants to the potential advertisers. These advertisers are not likely to be professionals and are more likely to be confused as to the source, affiliation or sponsorship of the defendants' pageants. This is especially so in light of the fact that some of the contestants actually believed that the Pittses *were* affiliated with plaintiff. Confusion in such an instance is more likely since these local advertisers are apt to purchase the advertising space on impulse. *See Sno–Wizard Manufacturing, Inc. v. Eisemann Products*, 791 F.2d 423, 428 (5th Cir.1986).

The court is also aware of the litigious nature of plaintiff in defending and protecting its trademarks. Thus, plaintiff has obtained injunctions against the users of names similar to its marks such as: (a) Miss Teen U.S.A. in *Miss Universe, Inc. v. Miss Teen Universe, Inc.*, 209 U.S.P.Q. 698 (N.D.Ga.1980); (b) Little Miss U.S.A. in *Miss Universe, Inc. v. Miss Little Miss U.S.A., Inc.*, 212 U.S.P.Q. 425 (N.D.Ga. 1981); (c) Miss Nude U.S.A., Ms. Nude U.S.A., Miss Nude–U.S.A. and Ms. Nude, U.S.A. in *Miss Universe, Inc. v. Flesher*, 433 F.Supp. 271 (C.D.Cal.1977), *modified*, 605 F.2d 1130 (9th Cir.1979); (d) Miss Black

---

**13.** Fran LaSalle testified that he received inquiries from "groomers" who wanted to know the date of his "MRS." pageant. He also said that he received calls from potential contestants, requesting entry blanks to his "MRS." pageant. Additionally, he testified that he received a call from an area merchant who was confused about whether she had placed an advertisement with him or with the defendants. Finally, he testified that he received a call from a judge, wanting to know why he wasn't told about La-Salle's "MRS." pageant. LaSalle believed that this confusion would have an adverse effect on his local pageants.

**14.** Mr. Pitts testified that he never volunteered to anyone the fact that he was not affiliated with the plaintiff. Deposition of Robert Pitts, Vol. II, pp. 10–11. Again, from the exhibits in the record, the court is left with the impression that the defendants sought to create the impression that they were affiliated with plaintiff.

Universe Beauty Pageant and Miss Black Universe International Beauty Pageant in *Miss Universe, Inc. v. International Pageant Productions, Ltd.* (S.Ct.N.Y. May 11, 1979); and (e) Miss Black U.S.A., Miss Black U.S.A. Beauty Pageant and Miss Black United States of America in *Miss Universe, Inc. v. International Pageant Productions, Ltd.* (S.Ct.N.Y. Aug. 24, 1979). Clearly, plaintiff has developed and protected its widely-recognized marks with a vengeance. Mr. Pitts was well aware of such, and has stated that he fully expected plaintiff to object to the use of his names.

After a careful consideration of all the relevant factors, the court finds that the defendants' use of the names MRS. USA, MRS. UNIVERSE and/or MRS. [STATE OR LOCALITY] USA is likely to create confusion. Thus, plaintiff has established a substantial likelihood of success on the merits of its claim under 15 U.S.C. § 1114.[15]

Plaintiff also seeks relief on the grounds that the defendants' use of the marks MRS. USA, MRS. UNIVERSE and MRS. [STATE OR LOCALITY] USA constitutes misrepresentation of the source or sponsorship of defendants' pageants, in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). That section prohibits the use in connection with any goods or services of a false designation of origin, or any false description or representation, including words or other symbols tending to falsely describe or represent the same, if related to interstate commerce.

Section 1125(a) does not specifically create a cause of action for trademark and trade name infringement. Instead, it is broadly worded to proscribe (1) the use of words or symbols (2) tending to falsely describe or represent (3) the source of origin (4) of goods or services (5) in commerce. *Moore, supra,* at 1184. When a trademark used by the plaintiff is so associated with its products, the use of the same mark by another company constitutes a representation that its goods come from the same source. *Id.; Boston Professional Hockey Assn., supra,* at 1010. Like claims of trademark infringement, the basic test for claims under 15 U.S.C. § 1125 is the likelihood of confusion. *Id.* Once a finding of confusion is made under § 1114, a finding of false representation of origin is made under § 1125. *Id.*

This court has found a likelihood of confusion under plaintiff's infringement claim and, likewise, finds a likelihood of confusion under plaintiff's claim of § 1125. Defendants' use of the marks in question is likely to create the false impression that their pageants originate with plaintiff. Thus, the court finds a substantive likelihood that plaintiff will also succeed on the merits of its claim under § 1125(a).

Because any possible injunction entered against defendants under the Lanham Act will be at least as broad as any that could be justified under state law, the court will not address plaintiff's claims under La.Rev. Stat. 51:1401 and 51:223.1 at this stage of the proceedings.[16] *See Moore, supra.*

---

**15.** In their written closing argument, the defendants place much reliance on *Miss World (UK) Limited, supra,* n. 8. In that case, the district court denied plaintiff's request for an injunction against the defendant's use of the mark MRS. of the WORLD. Plaintiff then filed an emergency motion in the Ninth Circuit seeking an injunction pending appeal and an expedited appeal. The court granted the motion in part by enjoining the defendant's use of the mark MRS. WORLD, but permitting the use of the mark MRS. of the WORLD. After briefing and argument, the Ninth Circuit vacated the district court's order and remanded for more detailed findings on the factors relevant to assessing the likelihood of confusion of the use of the mark MRS. of the WORLD. On remand, the district court again denied the motion for a preliminary injunction. On appeal, the Ninth Circuit af-

firmed. The case is not controlling. Here, there are no intervening connecting words. There is credible evidence of a real confusion and a substantial likelihood of additional confusion. There is also evidence of the defendants' intent to create the impression that their pageants were associated with plaintiff. Moreover, the balance of hardships weighs heavily in favor the the plaintiff and against the defendants, newcomers to the pageant industry.

**16.** Plaintiff argues that the Louisiana Antidilution statute, La.Rev.Stat. 51:223.1, is identical to New York's Antidilution statute and, therefore, should be accorded the same interpretation. If this were true, the statute might not apply to the instant case, as the products involved are similar and competitive. *See, Smithkline Beckman*

## SUBSTANTIAL THREAT OF IRREPARABLE INJURY:

As this court has noted, *Moore supra*, at 1184, trademark infringement cases involve a unique threat of irreparable injury. Because plaintiff may not control the quality of defendants' goods, plaintiff has lost and faces future losses of its own reputation and good will. This loss of control constitutes immediate, irreparable harm. *Id.*

Plaintiff's investment, along with contributions from corporate sponsors, has already been discussed. This huge investment, along with plaintiff's reputation and good will, are at risk, particularly at this critical time: the two months preceding the May 1989 MISS UNIVERSE contest. Irreparable injury, in a case such as this, ordinarily flows where there is a substantial probability of confusion because of the defendants' use of similar names. *Tricon Steamship Agency v. Tricom Shipping Agency*, No. 86–2596, slip op. at 5, 1987 WL 5605 (E.D.La. Jan. 22, 1987). Because the court finds that the plaintiff's good will and reputation, clearly its most precious asset, is jeopardized, there is a substantial threat of irreparable injury to plaintiff if an injunction is not issued.

## BALANCING OF INTERESTS:

The court also finds that the threatened injury to plaintiff outweighs any damage the injunction might cause to the defendants. Defendants' investment at this point is minimal. Also, both defendants are in other businesses. Mr. Pitts runs an advertisement company and Mrs. Pitts runs a modeling agency. Thus, an injunction will not prevent them from earning a livelihood. Additionally, the defendants can continue to conduct beauty pageants under a name they, themselves, have conceived, and for which they have already filed for a federal trademark—MRS. NORTH AMERICA. Clearly, the threat of injury to plaintiff is greater than that to the defendants, latecomers to the pageant industry, and whose products have not been heavily promoted. Thus, the court finds that the balance of equities favors plaintiff on this issue.

## PUBLIC INTEREST:

The court likewise finds this final element to be met. As the United States Supreme Court has said, protection of trademarks is desirable because trademarks foster competition and maintenance of high quality by securing to the producer the benefits of its good reputation. *San Francisco Arts and Athletics, Inc. v. U.S. Olympic Committee*, 483 U.S. 522, 107 S.Ct. 2971, 2978, 97 L.Ed.2d 427 (1987). Thus, the protection afforded by Congress allows a person to receive the benefits of its own efforts so that that person will have an incentive to continue to produce a quality product, that, in turn, benefits the public. *Id.* 107 S.Ct. at 2981. Also, as this court has noted, an injunction in trademark infringement in unfair competition cases is not adverse to the public interest. *Moore, supra*, at 1185. By ensuring correct information in the market place, the trademark laws reduce losses caused by misunderstanding and conceit and thus permit consumers and merchants to maximize their own welfare confident that the information presented is truthful. *Id.* The court finds, therefore, that enjoining the defendants from infringing upon plaintiff's marks is not adverse to the public interest.

## CONCLUSION

Because the court finds that plaintiff has met its burden of showing entitlement to a preliminary injunction, the court hereby ENJOINS the defendants from further use of the names MRS. USA, MRS. UNIVERSE and/or MRS. [STATE OR LOCALITY] USA to describe their beauty pageants until further order of this court. For the term of this injunction, the defendants are not to use these names in any advertisement, brochure or other publicity release.

An order consistent with the terms of this Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED.**

*Corp. v. Proctor & Gamble Company*, 591 F.Supp. 1229, 1246–1247 (N.D.N.Y.1984), *aff'd*, 755 F.2d 914 (2d Cir.1985). *But see Lesportsac,*

*Inc. v. K Mart Corp*, 617 F.Supp. 316, 319 (E.D. N.Y.1985), *aff'd*, 754 F.2d 71 (2d Cir.1985). The court need not address that issue now, however.

## ORDER

Because the court finds that plaintiff has met its burden of showing entitlement to a preliminary injunction,

IT IS ORDERED that the defendants are ENJOINED from further use of the names MRS. USA, MRS. UNIVERSE and/or MRS. [STATE OR LOCALITY] USA to describe their beauty pageants until further order of this court.

IT IS FURTHER ORDERED that, for the term of this injunction, the defendants are not to use these names in any advertisement, brochure or other publicity release.

IT IS FURTHER ORDERED that plaintiff deposit $25,000.00 into the registry of the court as security.

IT IS FURTHER ORDERED that the terms of this order shall be suspended until the defendants receive written notification from plaintiff that plaintiff has deposited the above sum into the registry of the court.