Hearing:
June 22, 2006

THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
Feb. 9, 2007

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

Miss Universe L.P., LLLP
v.
Community Marketing, Inc.

_____

Opposition No. 91160627
to application Serial No. 78132432
filed on May 31, 2002

_____

Andrea L. Calvaruso of Donovan & Yee LLP for Miss Universe
L.P., LLLP.

Community Marketing, Inc., pro se.

_____

Before Grendel, Zervas and Kuhlke, Administrative Trademark
Judges.

Opinion by Grendel, Administrative Trademark Judge:

On May 22, 2002, Community Marketing, Inc.

("applicant") filed the above-referenced application by

which it seeks registration on the Principal Register of the

mark MR. GAY UNIVERSE (in standard character form) for

services recited in the application as "entertainment

services in the nature of conducting gay beauty pageant," in

Class 41.  Applicant has disclaimed the exclusive right to

use GAY apart from the mark as shown, pursuant to the Trademark Examining Attorney's requirement during ex parte prosecution. The application is based on applicant's asserted bona fide intention to use the mark in commerce. Trademark Act Section 1(b), 15 U.S.C. § 1051(b).[1]

Registration of applicant's mark has been opposed by Miss Universe L.P., LLLP ("opposer"). As grounds for opposition, opposer alleges a claim of priority and likelihood of confusion under Trademark Act Section 2(d), 15 U.S.C. § 1052(d), and a dilution claim under Trademark Act Sections 43(c) and 13(a), 15 U.S.C. §§ 1125(c) and 1063(a). Opposer asserts ownership, registration and prior use of the mark MISS UNIVERSE and variations thereof, in connection with various goods and services related to beauty pageants. In particular, opposer has made of record status and title copies of the following registrations it owns:[2]

---

[1] As originally filed, the application was based on use in commerce under Trademark Act Section 1(a), 15 U.S.C. §1051(a). Applicant amended the basis to intent-to-use during ex parte prosecution of the application.

[2] Of these five registrations, only Registration No. 1597876 was specifically pleaded by opposer in the notice of opposition; opposer alleged that it owned this registration "among many others." (Notice of Opposition, ¶ 2.) However, at trial opposer submitted notices of reliance on status and title copies of all five registrations, without objection from applicant. We find that the issue of the status and title of these additional registrations has been tried with applicant's implied consent, and we accordingly deem the pleadings to be amended to include these additional registrations. *See* Fed. R. Civ. P. 15(b); Trademark Rule 2.107(a), 37 C.F.R. § 2.107(a).

- Registration No. 1597876, of the mark MISS UNIVERSE (in standard character form), for "entertainment services, namely, presentations of pageants and contests," in Class 41. Issued May 22, 1990; Affidavits under Sections 8 and 15 accepted and acknowledged; renewed;

- Registration No. 620557, of the mark MISS UNIVERSE (in standard character form), for "promoting the sale of goods and services by others through the medium of a beauty contest conducted on a national and regional basis," in Class 35. Issued January 31, 1956; Affidavits under Sections 8 and 15 accepted and acknowledged; renewed (twice);

- Registration No. 1182063, of the mark MISS UNIVERSE (in standard character form), for "magazine concerning the schedule and participants in beauty pageants," in Class 16. Issued December 15, 1981; Affidavits under Sections 8 and 15 accepted and acknowledged; renewed;

- Registration No. 1146211, of the mark MISS UNIVERSE (in standard character form), for "ladies' blouses, shirts, bathing suits, shoes, beach jackets, pants, sweaters, skirts, T-shirts, slips, petticoats, nightgowns, robes, gloves, hosiery and panties," in Class 25. Issued January 20, 1981; Affidavits under Sections 8 and 15 accepted and acknowledged; renewed; and

- Registration No. 2733781, of the mark MISS NUDE UNIVERSE (in standard character form; NUDE disclaimed), for "entertainment in the nature of beauty pageants," in Class 41. Issued July 8, 2003.

Applicant filed an answer by which it denied the salient allegations of the notice of opposition, and asserted several "affirmative defenses" which in fact are merely further arguments in support of its denials.

The evidence of record consists of the file of applicant's involved application; the pleadings herein;

3

opposer's testimony deposition of Anthony Santomauro (opposer's Vice President of Business Planning) and exhibits thereto; opposer's notice of reliance on the discovery deposition of Thomas Roth (applicant's president) and exhibits thereto; opposer's notices of reliance on status and title copies of the above-referenced registrations; and applicant's notice of reliance on various documents including opposer's interrogatory responses, certain Office records, and certain articles from printed publications.[3]

The case is fully briefed, and an oral hearing was held at which both parties presented arguments. After careful consideration of all of the evidence and the arguments of the parties (including any evidence and arguments not specifically discussed in this opinion), we sustain opposer's Section 2(d) ground of opposition. In view thereof, we need not and do not reach opposer's dilution claim.

Before we reach the merits of this case, an initial comment is in order. We note that opposer has submitted

---

[3] In an order issued on September 16, 2005, the Board granted opposer's motion to strike one of the exhibits covered by applicant's notice of reliance, i.e., a TTABVUE list of Board proceedings in which opposer has been a party. Opposer, in its briefs, has asserted other objections to various portions of applicant's evidence and to various assertions made in applicant's brief on the case. To the extent that it is necessary or relevant to our decision herein, we shall address these objections (many of which go to the probative value of the evidence, rather than to its admissibility) in our discussion of the merits of the case, *infra*.

with its brief an appendix consisting of a nearly six-inch stack of documents, which are duplicates of essentially all of the depositions, exhibits and documents already made of record by the parties at trial.  Although the Board infers that such appendix was included with the intent of aiding the Board in its review of the case and/or supporting the assertions and arguments contained in opposer's brief, in actuality the appendix merely adds unnecessarily to the size of the record, which the Board must review in its entirety in any event. *See ITC Entertainment Group Ltd. v. Nintendo of America Inc*., 45 USPQ2d 2021, 2022 (TTAB 1998), wherein the Board stated:

> The Board notes that the parties' attorneys have filed unnecessary copies of motions and briefs and unnecessary attachments to motions and briefs. The stack of such papers is nearly a foot high and weighs in excess of 15 pounds.  Apart from the natural resources wasted on these filings, and the unnecessary and no doubt significant expense to the parties attributable to organizing and copying these papers, the Board has wasted precious time sorting through the case files to determine what documents must be retained and which may be ignored as unnecessary.

Thus, references in the brief to particular pieces of evidence should be to the location of the evidence in the actual record, not to its location in an appendix.  Opposer should forego such "appendix" practice in any future cases before the Board.

Because opposer has properly made its pleaded registrations of record, and because opposer's likelihood of confusion claim is not frivolous, we find that opposer has established its standing to oppose registration of applicant's mark. *See Lipton Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185 (CCPA 1982); *see also Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000);

Moreover, because opposer's pleaded registrations are of record, Section 2(d) priority is not an issue in this case as to the mark and goods or services covered by said registrations. *See King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974). In any event, opposer has proven use of its MISS UNIVERSE mark which predates applicant's May 31, 2002 application filing date, which is the earliest date upon which applicant may rely for priority purposes in this case.

Our likelihood of confusion determination under Section 2(d) is based on an analysis of all of the facts in evidence that are relevant to the factors bearing on the likelihood of confusion issue (the *du Pont* factors). *See In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). *See also Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005); *In re Majestic Distilling Co.,* 315

F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003); *In re Dixie Restaurants Inc.*, 105 F.3d 1405, 41 USPQ2d 1531 (Fed. Cir. 1997).

We begin our likelihood of confusion analysis with the fifth *du Pont* factor, which requires us to consider evidence of the fame of opposer's mark and to give great weight to such evidence if it exists. *See Bose Corp. v. QSC Audio Products Inc.*, 293 F.3d 1367, 63 USPQ2d 1303 (Fed. Cir. 2002); *Recot Inc. v. Becton*, 214 F.3d 1322, 54 USPQ2d 1894 (Fed. Cir. 2000); *Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.*, 963 F.2d 350, 22 USPQ2d 1453 (Fed. Cir. 1992). As the court noted in *Bose Corp.*:

> Fame of an opposer's mark or marks, if it exists, plays a "dominant role in the process of balancing the *DuPont* factors," *Recot*, 214 F.3d at 1327, 54 USPQ2d at 1456 [sic – 1897], and "[f]amous marks thus enjoy a wide latitude of legal protection." *Id*. This is true as famous marks are more likely to be remembered and associated in the public mind than a weaker mark, and are thus more attractive as targets for would-be copyists. *Id*. Indeed, "[a] strong mark … casts a long shadow which competitors must avoid." *Kenner Parker Toys*, 963 F.2d at 353, 22 USPQ2d at 1456. A famous mark is one "with extensive public recognition and renown." *Id*.

*Bose Corp. v. QSC Audio Products Inc.*, *supra*, 63 USPQ2d at 1305.

The March 3, 2005 testimony deposition of Anthony Santomauro, opposer's Vice President of Business Planning,

and the exhibits thereto, establish the following undisputed facts. Opposer first used its MISS UNIVERSE mark in connection with beauty pageants "around 1950" and has conducted its pageant every year since then. (Santomauro Dep. at 12.) In format, opposer's annual MISS UNIVERSE pageant is the finals of an international contest, at which all of the winners of approximately ninety preliminary national pageants compete for the title of MISS UNIVERSE. (*Id*. at 21.) These ninety contestants are eventually narrowed to fifteen finalists, who make up the field for the final contest which is televised internationally. (*Id*. at 21-22.)

The airing on television of opposer's annual MISS UNIVERSE pageant is quite successful, by any measure. According to Exhibit 2 to Mr. Santomauro's deposition (which consists of records from opposer's television network partners), and to Mr. Santomauro's testimony regarding Exhibit 2, the 2004 MISS UNIVERSE pageant broadcast had the highest overall rating among men and women in the United States aged eighteen to forty-nine, with thirteen million American households viewing the program. Twelve million households viewed the pageant on television in 2003, and eleven million households viewed the pageant on television in 2002. We find these numbers to be substantial. In each of those three years, opposer's pageant had the highest

viewership of any program offered on the night of airing. (*Id*. at 13-20.)  The MISS UNIVERSE mark is prominently used and displayed throughout the broadcast.  (*Id*. at 12-13).

The ultimate winner of the annual pageant is crowned "Miss Universe," and she reigns for one year.  During that time, her responsibilities include touring the world representing opposer's organization, and engaging in fundraising activities for charity.  (*Id*. at 25.)  Miss Universe, and opposer's pageant, receive a significant amount of media coverage (in addition to the pageant broadcast itself).  Media coverage is heaviest immediately after the pageant broadcast, but it continues throughout the winner's reign.  (*Id*. at 28-29.)

Television programs which regularly feature or report on the annual pageant and its titleholder include NBC's Today Show, The Tonight Show with Jay Leno,[4] Access Hollywood, Inside Edition, as well as coverage on CNN, Telemundo and other networks.  (*Id*. at 29-30.)  Print media coverage is equally broad; items about opposer's annual MISS UNIVERSE pageant and its new titleholder appear in all of the major market newspapers such as The New York Times, The

---

[4] The witness identified this program as "Late Night with Jay Leno."  We take judicial notice that late night programming in the United States includes "Late Night with David Letterman," and "The Tonight Show with Jay Leno."  We presume that the witness simply misspoke, and deem that mistake to be non-material to our findings herein.

Los Angeles Times, the New York Post, and The Washington Post.  Coverage also appears in all of the "fashion" magazines, in general interest magazines such as Cosmo and People, and in the in-flight magazines provided to travelers by the airlines.  (*Id.* at 30.)

Opposer has a "Miss Universe" website which prominently features the MISS UNIVERSE mark.  The website received "nearly a billion" hits in 2004.  (*Id.* at 31-32.)  Well-known companies, including CoverGirl, American Airlines and others, pay opposer every year for the right to be named as sponsors of the pageant.  (*Id.* at 36.)  Opposer's gross annual revenue, from sources such as broadcast license fees, host city license fees, and personal appearances by Miss Universe, totals over $24 million per year.  Although the record is silent as to opposer's annual advertising expenditures, it is apparent from the ratings of the annual broadcast, the corresponding media coverage, and the desirability of the pageant as a vehicle for sponsorship by other companies, that any advertising opposer does is effective.  Opposer spends $300,000 per year policing its MISS UNIVERSE marks, including initiating numerous proceedings before the Board over the years.  (*Id.* at 38-39.)

Finally, we note that, in a "late 2004" internal communication (Roth Discovery Dep. Exh. 5, which Mr. Roth

10

identified as a rough draft of a possible franchise agreement which was never seen by others outside applicant's company), Mr. Spradlin, one of applicant's principals, wrote as follows, inter alia:  "The most renowned Contest is the Miss Universe Pageant conceived in the 60's and now owned by Donald Trump and CBS."  In its brief, applicant asserts that this statement by Mr. Spradlin was not an acknowledgment that the fame of opposer's mark extended to applicant's services, i.e., gay beauty pageants.

We find, however, that no such restrictive interpretation is proper for Mr. Spradlin's statement.  The statement was included in a draft franchise agreement by which applicant hoped to enlist franchisees for its pageant, but nothing in the statement itself or the reference to opposer's pageant is limited in the way applicant argues. *Cf. Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin*, *supra*, 396 F.3d at 1376, 73 USPQ2d at 1695 ("Moreover, Palm Bay's President, David Taub, admitted that the VEUVE CLICQUOT mark is famous.  His later qualification that such fame was limited to the 'top-end' segment of the market does not diminish the significance of his admission in view of the Board's finding that high-end champagne and less-expensive sparkling wines are marketed in the same channels of trade to the same consumers.")  We therefore find that Mr. Spradlin's statement is evidence that even applicant

11

considers opposer's mark to be famous, a fact which further corroborates our finding under the fifth *du Pont* factor that opposer's MISS UNIVERSE mark is famous.

Based on this undisputed evidence of record, we find that opposer's MISS UNIVERSE mark is famous for purposes of the fifth *du Pont* factor.[5]  Such fame must be accorded dominant weight in our likelihood of confusion analysis. *Recot*, 214 F.3d at 1327, 54 USPQ2d at 1897.

We turn next to the second *du Pont* factor, i.e., the similarity or dissimilarity of the parties' services.  It is settled that it is not necessary that the respective services be identical or even competitive in order to support a finding of likelihood of confusion.  That is, the issue is not whether consumers would confuse the services themselves, but rather whether they would be confused as to the source of the services.  It is sufficient that the services be related in some manner, or that the circumstances surrounding their use be such that they would be likely to be encountered by the same persons in situations that would give rise, because of the marks used thereon, to a mistaken belief that they originate from or are in some way associated with the same source or that there is an association or connection between the sources of

---

[5] We need not and do not reach the issue of whether opposer's mark is famous for purposes of its dilution claim, because as noted above, we are not reaching that claim.

the respective services. *See In re Martin's Famous Pastry Shoppe, Inc.*, 748 F.2d 1565, 223 USPQ 1289 (Fed. Cir. 1984); *In re Melville Corp.*, 18 USPQ2d 1386 (TTAB 1991); and *In re International Telephone & Telegraph Corp.*, 197 USPQ 910 (TTAB 1978).

Applicant's services, as recited in the application, are "entertainment services in the nature of conducting gay beauty pageant." Opposer's services, as recited in its Registration No. 1597876 (MISS UNIVERSE), are "entertainment services, namely, presentations of pageants and contests" in Class 41. The services recited in opposer's Registration No. 620557 (MISS UNIVERSE) are "promoting the sale of goods and services by others through the medium of a beauty contest conducted on a national and regional basis" in Class 35.[6]

Based on these respective recitations of services, *see Hewlett-Packard Co. v. Packard Press Inc.,* 281 F.3d 1261, 62 USPQ2d 1001 (Fed. Cir. 2002), we find that applicant's services are identical to opposer's services insofar as both

---

[6] We note that opposer, in its briefs, has presented no arguments pertaining specifically to the issue of likelihood of confusion between applicant's mark and services and the marks and goods or services covered by opposer's other three pleaded registrations, i.e., Registration No. 1182063 (MISS UNIVERSE for magazines), Registration No. 1146211 (MISS UNIVERSE for clothing items), and Registration No. 2733781 (MISS NUDE UNIVERSE for beauty pageants). In view thereof, we shall give no consideration to opposer's pleaded Section 2(d) claim insofar as it is based on these other three registrations, and shall consider opposer's Section 2(d) claim only as it pertains to opposer's MISS UNIVERSE registrations in Classes 35 and 41.

parties' services involve conducting or presenting entertainment services in the nature of beauty pageants. Also, the evidence of record shows that the intended format of applicant's beauty pageant is or will be essentially identical to the format of opposer's pageant. For example, both pageants are or will involve preliminary regional contests which lead to a televised final pageant featuring celebrity masters of ceremonies, celebrity entertainers and celebrity judges. (Roth Dep. at 58-61; Santomauro Dep. at 21-24.)

Applicant argues that the parties' respective pageants are not directly competitive and would not be confused for each other due to the difference in the contestant pools for each pageant, with opposer's MISS UNIVERSE pageant involving unmarried females and applicant's MR. GAY UNIVERSE pageant involving gay males. However, the issue is not whether the two pageants will be confused for one another or whether the relevant public will be able to distinguish between the pageants themselves. Rather, the issue is whether the relevant public will assume, due to the similarity of the marks, that there is a source, sponsorship or other connection between the two pageants. The difference in the respective contestant pools is not dispositive, if the public is likely to assume that applicant's pageant is an

offshoot of or is otherwise affiliated with opposer's famous pageant.

> The likelihood of confusion in this case does not stem only from the possibility that a consumer might mistake the defendants' services for those of the plaintiff. The real danger lies in the probability that this same consumer may associate the defendants with the plaintiff. Thus, it would be quite reasonable to assume that the defendant's MRS. USA pageant [a contest involving married women only] is an offshoot of the plaintiff's MISS USA pageant [a contest involving unmarried women only].

*Miss Universe, Inc. v. Pitts*, 714 F.Supp. 209, 216-17, 14 USPQ2d 2004, 2010 (W.D. La. 1989)(internal citation omitted).

Likewise, in a case finding a likelihood of confusion between the marks MISS AMERICA (for a pageant involving females aged 18 to twenty-eight years old) and LITTLE MISS AMERICA (for a pageant involving females aged five to ten years old), the predecessor to our primary reviewing court found as follows: "Though the record discloses vast differences in the scale and details of their operations, it seems to us that both would be perceived by the public at large as being in the same general business." *Palisades Pageants, Inc. v. Miss America Pageant*, 442 F.2d 1385, 1388, 169 USPQ 790, 793 (CCPA 1971). *See also Miss Universe Inc. v. Drost*, 189 USPQ 212 (TTAB 1976)(finding likely confusion

between the marks MISS USA and MISS NUDE USA, both for beauty pageants).

Applicant also argues that by "long standing tradition," male and female pageants are so "well divided" that purchasers are accustomed to distinguishing between male and female pageants as to source. There is no evidence in the record to support this assertion. Applicant cites the co-existence on the Register of third-party registrations of marks including MISS AMERICA and MR. AMERICA, and MISS U.S.A. and MR. U.S.A.[7] However, these third-party registrations are "of little material significance" in determining likelihood of confusion "since the existence of these registrations is not evidence of what happens in the marketplace or of the fact that consumers are familiar with them. Moreover, the inclusion on the register of confusingly similar marks cannot aid an applicant to register another mark which is likely to cause confusion." *Miss Universe v. Drost, supra*, 189 USPQ at 213-14. Further with respect to applicant's "male vs. female" argument, see *Augusta National, Inc. v. The Northwestern Mutual Life Ins. Co.*, 193 USPQ 210, 220 (S.D. Ga. 1976)("Defendant has sought

---

[7] We note that in the MR. U.S.A. registration (Reg. No. 1253816, which has been cancelled under Section 8), the goods are identified as "T-shirts and sport shirts," goods which are different than the beauty contest services recited in the MISS U.S.A. registration (Reg. No. 808974). Such a difference in the goods and services identified in the respective registrations is

16

to make much of the fact that the Masters is a men's [golf] tournament, while NMC's is for women only, thereby eliminating any confusion between the two. But that fact would not prevent the public from believing that both Masters were being sponsored and operated by Augusta National").

Finally, applicant argues that its pageant and opposer's pageant will not be confused because applicant's pageant involves gay contestants while opposer's pageant involves straight contestants. This argument is unpersuasive because, first, opposer's recitation of services is worded broadly enough that it encompasses both gay and straight pageants. More fundamentally, however, and as noted above, the issue is not whether the two pageants would be confused for each other, but whether the public will mistakenly assume, due to the similarity of the marks, that there is a source connection or affiliation between applicant's pageant and opposer's pageant.

In summary, we find under the second *du Pont* factor that applicant's services are similar rather than dissimilar to opposer's services. Both parties are conducting or intend to conduct beauty pageants. This basic similarity between the services outweighs any dissimilarity that might

---

likely to have contributed to the Office's allowance of both marks to be registered.

17

be presumed from the fact that the public may be able to distinguish between the two pageants themselves due to their different contestant pools. The second *du Pont* factor therefore weighs in favor of a finding of likelihood of confusion.

Under the third *du Pont* factor, we must determine the similarity or dissimilarity of the trade channels and classes of purchasers for the parties' respective services. Because there are no limitations as to trade channels or classes of purchasers in either applicant's or opposer's respective application and registrations, we must presume that each party's services are marketed in all normal trade channels and to all normal classes of purchasers for such services. *In re Elbaum*, 211 USPQ 639 (TTAB 1981).

Applicant's pageant might initially be of more interest to a gay audience than to a straight audience, but applicant has stated that it intends that its pageant eventually will be watched by the public at large, including straight as well as gay viewers. See Roth Dep. Exh. No. 4 ("We expect that with the increasing public interest in everything 'gay' these days ... we stand to be quite successful in our efforts"); Roth Dep. Exh. No. 6 (the "creation of a national Mr. Gay Universe Contest is a function of the recent acceptance of the gay culture as a whole within the larger society"). The record also shows that applicant intends to

18

seek corporate and host city sponsors for its pageant, including the same types of sponsors, and even some of the same sponsors, as those which sponsor opposer's pageant. (Roth Dep. at 32-35.)

For these reasons, we find that the trade channels and classes of purchasers for applicant's services are similar rather than dissimilar, and that the third *du Pont* factor accordingly weighs in favor of a finding of likelihood of confusion.

Under the fourth *du Pont* factor (conditions of purchase) we find that applicant's and opposer's beauty pageants will be marketed to and viewed by ordinary consumers, who will not necessarily exercise a great deal of care in viewing or reading about the respective pageants. A television viewer who sees a television listing or an advertisement for applicant's MR. GAY UNIVERSE pageant, or a consumer who encounters press coverage of applicant's pageant, will not exercise great care in determining whether applicant's pageant is affiliated with or related to opposer's pageant. We therefore find that the fourth *du Pont* factor weighs in favor of a finding of likelihood of confusion.

We turn next to the first *du Pont* factor, which requires us to determine the similarity or dissimilarity of the marks when viewed in their entireties in terms of

19

appearance, sound, connotation and overall commercial impression. *Palm Bay Imports, Inc., supra*. The test, under the first *du Pont* factor, is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in terms of their overall commercial impression that confusion as to the source of the goods offered under the respective marks is likely to result. The focus is on the recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks. *See Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106 (TTAB 1975). Furthermore, although the marks at issue must be considered in their entireties, it is well-settled that one feature of a mark may be more significant than another, and it is not improper to give more weight to this dominant feature in determining the commercial impression created by the mark. *See In re Chatam International Inc.,* 380 F.3d 1340, 71 USPQ2d 1944 (Fed. Cir. 2004); *In re National Data Corp.*, 753 F.2d 1056, 224 USPQ 749 (Fed. Cir. 1985).

Applying these principles in the present case, we find that applicant's MR. GAY UNIVERSE mark is similar rather than dissimilar to opposer's MISS UNIVERSE mark. First, we find that the dominant feature of both marks is the word UNIVERSE. We do not disregard the other elements of the respective marks, i.e., the words MR. GAY in applicant's

mark and the word MISS in opposer's mark, but we find that these other elements contribute relatively less to the overall commercial impressions of the two marks. The word UNIVERSE is only slightly suggestive as applied to beauty pageants; indeed, it is somewhat fanciful to the extent that the contestants and winners of the pageants do not come from different parts of the universe, but merely from different parts of planet earth.

By contrast, MR. GAY is highly suggestive if not descriptive of a basic feature of applicant's pageant, i.e., that its contestants are gay males. As noted above, applicant has disclaimed the word GAY apart from the mark as shown. Likewise, we find that the word MISS in opposer's mark is highly suggestive as applied to opposer's pageant services, in that it merely informs the public that the contestants in opposer's pageant are unmarried females. As discussed above in connection with the second *du Pont* factor, the fact that viewers and other purchasers of the respective services would be able to distinguish between the pageants themselves based on the difference in contestant pools does not preclude a finding that they are likely to be confused as to the source of the two pageants. Likewise, the presence of MR. GAY and MISS in the respective marks merely serves to identify and differentiate the specific pools of contestants for the respective pageants, not the

21

source of the two pageants, which is likely to be determined by consumers based on the presence of UNIVERSE in both marks.

Due to the presence of the word UNIVERSE in each of the marks, the marks when considered in their entireties are similar rather than dissimilar in terms of appearance, sound, connotation and overall commercial impression. Both marks consist of the distinctive term UNIVERSE, preceded by highly suggestive or descriptive terms which merely identify the different contestant pools, without distinguishing source. MR. GAY merely "directs attention to the word[] which follows," i.e., UNIVERSE, just as MISS does in the MISS UNIVERSE mark. *Palisades Pageants, Inc., supra*, 169 USPQ at 793. *See also Miss Universe Inc. v. Drost, supra*, 189 USPQ at 214 (in the mark MISS NUDE USA, "[t]he word 'NUDE' ... is merely an adjective, is clearly subordinate to the notation 'U.S.A.' which it modifies, and does not serve to distinguish applicant's mark from that of opposer [MISS U.S.A.]").

Applicant contends that consumers are accustomed to distinguishing between the sources of beauty pageants which use MR. and MISS prefixes with the same geographic suffixes, such as MR. AMERICA and MISS AMERICA. There is no evidence in the record to support this contention. The few third-party registrations made of record by applicant do not prove

22

that the marks depicted therein are in use or are familiar to consumers, *see Miss Universe Inc. v. Drost, supra*, and there is no other evidence in the record showing the extent of use, if any, of these third-party marks.

For these reasons, we find that the similarity of the marks which arises from the presence of the word UNIVERSE in both marks clearly outweighs the differences between the marks which result from the different additional words in the respective marks, i.e., MR. GAY and MISS.  Viewed in their entireties, we find that the marks are similar rather than dissimilar, and that the first *du Pont* factor accordingly weighs in favor of a finding of likelihood of confusion.

The sixth *du Pont* factor requires us to consider evidence of "use of similar marks on similar goods [or services]."  We find that there is no evidence in the record which would support a finding that marks similar to applicant's and opposer's are in use in connection with beauty pageant services.  The few third-party registrations submitted by applicant are not evidence of use of those registered marks under the sixth *du Pont* factor.  *See Olde Tyme Foods Inc. v. Roundy's Inc.*, 961 F.2d 200, 22 USPQ2d 1542 (Fed. Cir. 1992).  Additionally, we find that the existence, vel non, of these other registered marks which incorporate the terms MISS, MRS. or MR. for beauty pageants

are not "similar marks" for purposes of the sixth *du Pont* factor.  Rather, in this case the relevant inquiry under the sixth *du Pont* factor is whether there are other UNIVERSE marks in use.

The record suggests that only one other UNIVERSE mark exists, i.e., the MR. UNIVERSE mark which is used in connection with the sport of bodybuilding.  The evidence on this issue is slight, at best, consisting only of an article about former "Mr. Universe" Steve Reeves and an article about former "Mr. Universe" Arnold Schwarzenegger.  The latter article mentions the "Mr. Universe" title only once, and only in passing.  Even assuming that this evidence establishes that purchasers are aware of the MR. UNIVERSE mark, we find that such mark is not particularly probative under the sixth *du Pont* factor because the services in connection with which the mark is used are not similar to the services involved in this case.  Bodybuilding contests, which are the subject of the MR. UNIVERSE mark, are sports events, not beauty pageants.  Bodybuilding is a sport in which the contestants are athletes; it is not a beauty pageant such as applicant's or opposer's.  See, e.g., the Flex magazine article on Arnold Schwarzenegger made of record by applicant, which repeatedly refers to Mr. Schwarzenegger as an athlete, and to bodybuilding as a sport, not a beauty pageant.  (Regarding an early defeat,

24

"Arnold accepted it like an athlete..."; "All I have to say is that bodybuilding is a sport that is decided by a judging panel"; and "I think Arnold exemplified everything – physique and personality wise – that Joe [Weider] looked for in an athlete.  He probably felt that with Arnold, who had such tremendous drive, his own dream for the sport could come true faster.")

For these reasons, we find that the sixth *du Pont* factor is neutral at best in this case; it certainly does not weigh significantly in applicant's favor.

Applicant makes certain other arguments in its brief, none of which we find to be persuasive and which we shall address summarily in this decision.  First, it is not dispositive or even relevant that applicant was able to convince the Trademark Examining Attorney during ex parte examination to pass applicant's mark to publication.  *See Miss Universe Inc. v. Drost, supra.*  Second, even if we accept as true applicant's contention that it adopted its mark in good faith, such good faith adoption does not establish the absence of a likelihood of confusion, nor does it negate the other evidence of record which weighs in favor of a finding of likelihood of confusion.

Finally, the fact that opposer was the plaintiff in a 1978 opposition proceeding (No. 91062042) involving its MISS U.S.A. mark and a third party's MR. USA mark, in which the

opposition ultimately was terminated and a registration issued to the applicant, is of no probative value in the present case.  The only evidence pertaining to this prior case are TTABVUE and TARR records, which show only that the proceeding was filed on December 27, 1978 and instituted on March 6, 1979, that the applicant filed an answer on April 2, 1979, that an "appeal to CAFC" was taken on October 26, 1981, that the opposition was terminated on July 27, 1983, that a registration (Reg. No. 1253816) was issued to the applicant on October 11, 1983, and that the registration subsequently was cancelled under Section 8.  There is no evidence from which we might ascertain the basis for the Board's apparent dismissal of the opposition and the Federal Circuit's apparent affirmance of such dismissal.  We note that the goods identified in the third-party applicant's MR. USA application and registration were Class 25 clothing goods, a fact which in itself may have been the basis for a finding of no likelihood of confusion (assuming that such finding was in fact the basis of the decision and outcome of the case).  The point is that we cannot determine what the basis of the decision in the prior case was; that case therefore is of no probative value.  To the extent that applicant is arguing that this prior case has some sort of res judicata or collateral estoppel effect in the present

case, such contention is without merit given the differences in the marks and goods at issue in the prior case.

In summary, we have reviewed all of the evidence of record as it pertains to the *du Pont* likelihood of confusion factors. Based on that evidence, and for the reasons discussed above, we conclude that a likelihood of confusion exists. Applicant's arguments to the contrary are not persuasive. To the extent that any doubts might exist as to the correctness of our likelihood of confusion determination, we resolve such doubts against applicant. *See Ava Enterprises Inc. v. Audio Boss USA Inc.,* 77 USPQ2d 1783 (TTAB 2006)*; Baseball America Inc. v. Powerplay Sports Ltd.,* 71 USPQ2d 1844 (TTAB 2004).

As noted above, because we have found for opposer on its Section 2(d) ground of opposition, we need not and do not reach opposer's dilution claim.

Decision:  The opposition is sustained.

27